IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| *Plaintiff,* | § § | SA-19-CR-00564-OLG |
| vs. | § § | |
| (1) MICHAEL ANTWONE LOVINGS, | § § § | |
| *Defendant.* | § § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable Chief United States District Judge Orlando L. Garcia:**

This Report and Recommendation concerns Defendant's Motion to Suppress Evidence [#25] and Defendant's Motion to Suppress Statement [#26], which were referred to the undersigned for a report and recommendation pursuant to Western District of Texas Local Rule CV-72 and Appendix C. The undersigned has authority to enter this recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, it is recommended that Defendant's motions be **DENIED**.

**I.  Background**

Defendant Michael Antwone Lovings was charged on August 7, 2019, with a two-count indictment for possession with the intent to distribute 28 grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1)/(b)(1)(B) and for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Redacted Indictment [#10] at 1.) Prior to Lovings's indictment, a search warrant was executed on July 25, 2019 at a residence located on Kansas Street in San Antonio,

Texas, by officers with the San Antonio Police Department ("SAPD").[1] The search resulted in the seizure of eight bags of crack cocaine (approximately 285 grams), $1,280 in currency, and multiple firearms (one of which was stolen) and ammunition, among other items. During the search, officers also obtained a signed acknowledgment of the possession of the seized contraband from Lovings.

Lovings now moves to suppress the seized evidence and his confessions.[2] Lovings argues that the search warrant affidavit filed by SAPD Detective Eugene Valdez was not supported by probable cause and therefore the evidence obtained as a result of the search must be suppressed. Lovings contends that the signed acknowledgment was obtained by coercion and therefore must also be suppressed.

The parties agreed that the motion to suppress evidence could be decided on the written briefing, as the legal adequacy of Detective Valdez's affidavit could be ascertained based solely on the four corners of the affidavit. The Court held a live evidentiary hearing on the motion to suppress statement on October 20, 2020, at which Lovings, Detective Valdez, six SAPD officers, and an Alcohol, Tobacco, Firearms, and Explosives Task Force ("ATF") Officer testified. For the reasons that follow, the Court should deny both motions.

---

[1] An affidavit executed by Lovings and attached to one of the motions to suppress states that the searched residence was the home of Jazzman Blackwell, his "baby-momma" and that he would stay there overnight "occasionally." (Lovings Aff. [#26-1] at 1.) Lovings provided testimony at the Court's hearing on the motion to suppress statement consistent with this affidavit.

[2] Lovings's motion to suppress statement only references the signed acknowledgement obtained by officers during the execution of the search warrant. However, testimony at the Court's hearing established that Lovings made subsequent oral statements in discussing the firearms with the officers that were also incriminating.

## II.  Motion to Suppress Evidence

Lovings challenges the legal sufficiency of the affidavit underlying the search warrant. The Fourth Amendment protects against unlawful searches and seizures and demands that entry into an individual's home be supported by consent, a valid warrant, or both probable cause and exigent circumstances.  *United States v. Jones*, 239 F.3d 716, 719 (5th Cir. 2001).  Where a search is executed pursuant to a search warrant, as here, the warrant may only be issued upon a finding of probable cause.  *United States v. Brown*, 941 F.2d 1300, 1302 (5th Cir. 1991). Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Even if a warrant is deemed to lack probable cause after a search warrant has been executed, the fruit of the search may still be admissible under "the good-faith exception" to the warrant requirement if the executing officer's reliance on the warrant "was objectively reasonable and made in good faith."  *United States v. Woerner*, 709 F.3d 527, 533 (5th Cir. 2013); *see also United States v. Leon*, 468 U.S. 897, 920–21 (1984).  When considering a challenge to a search made pursuant to a warrant, the court employs a two part test—first, whether the good-faith exception to the exclusionary rule applies and second, whether the warrant was supported by probable cause.  *United States v. Rojas Alvarez*, 451 F.3d 320, 329–30 (5th Cir. 2006).  Courts are to consider the totality of the circumstances in evaluating probable cause.  *Gates*, 462 U.S. at 238.

The good-faith exception does not apply in certain circumstances, however, such as (1) where the issuing magistrate was misled by information that the affiant knew or reasonably should have known was false; (2) when the issuing magistrate wholly abandoned the judicial role; (3) when the warrant affidavit is so lacking in indicia of probable cause as to render believe

in its existence unreasonable; or (4) when the warrant is so facially deficient in failing to particularize the place to be searched or things to be seized that executing officers cannot reasonably presume it to be valid. *Woerner*, 709 F.3d at 534. Lovings argues here that Detective Valdez's affidavit fell under the third category and was a "bare bones" affidavit lacking in any indicia of probable cause. "'Bare bones' affidavits typically contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *United States v. Pope*, 467 F.3d 912, 920 (5th Cir. 2006) (internal citation omitted). Lovings also argues the affidavit failed to satisfy the requirement that warrants describe the place to be searched and persons to be seized with particularity.

**A.      The Search Warrant Affidavit is not "Bare Bones."**

A copy of the affidavit at issue is attached to Lovings's motion [#25-1]. The affidavit states that Detective Valdez was given information from a confidential informant that Lovings and Jazzman Blackwell (Lovings's girlfriend and the mother of his infant son) were selling crack cocaine from inside the residence. The affidavit further states that the confidential informant had been inside the residence and had seen a large amount of crack cocaine there within the last 48 hours. The informant was described as being "a credible and reliant informant that has given information in the past that has proven to be reliable and credible." Photo identification was shown to the CI who confirmed the identity of Lovings and Blackwell.

The affidavit also states that Detective Valdez had conducted several weeks of surveillance at the residence and observed both Lovings and Blackwell going in and out of the residence and locking the door behind them. Detective Valdez also recovered several police reports placing Lovings and Blackwell at the residence to be searched. Finally, the search warrant affidavit provides that both Lovings and Blackwell had been convicted on prior narcotics

charges and that Detective Valdez had received several neighborhood complaints through officers with SAPD's community policing unit, SAFFE (San Antonio Fear Free Environment), regarding suspected narcotics traffic coming from the residence.

Having reviewed the four corners of the affidavit, the undersigned concludes that it is not a "bare bones" affidavit. Where an affidavit contains facts personally observed by a confidential informant, it is not bare bones. *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992). Here, the confidential informant relayed information regarding narcotics trafficking based on his personal experience of being inside the residence and seeing a large amount of crack cocaine there within the past 48 hours. An officer's reliance on an informant's "report of recent, personal observation" of illicit drugs in the premises to be searched is objectively reasonable. *United States v. Cordero*, 465 F.3d 626, 630 (5th Cir. 2006) (rejecting argument that affidavit was bare bones where informant relayed information based on personal observation). *Cf. United States v. Barrington*, 806 F.2d 529, 531 (5th Cir. 1986) (holding that affidavit containing only generic statement that affiant had received information from confidential informant without identifying nature of that information or how it was personally known to informant was bare bones).

Detective Valdez's affidavit also contains a factual basis for the credibility of the informant's statements, in that the informant had given information in the past that proved to be reliable and credible. *See United States v. Hall*, 545 F.2d 1008, 1009 (5th Cir. 1977) (A factual basis for the credibility of an informant can be supplied by "an explicit claim of past reliability."). Given the informant's personal observations of drug trafficking, Detective Valdez's receipt of neighborhood complaints of narcotics trafficking, and the confirmation that Lovings would be found in the residence through Detective Valdez's own surveillance and the

reports of the informant, the officers executing the warrant acted in good faith in relying on the warrant's validity.

**B.     The Search Warrant Satisfied the Particularity Requirement.**

The Court should also reject Lovings's additional argument that the search warrant failed to describe the items to be seized with sufficient particularity. A warrant must describe the things to be seized with particularity because indiscriminate searches and seizures conducted under "general warrants" run afoul of the Fourth Amendment. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004); *Walter v. United States*, 447 U.S. 649, 657 (1980). Although a search warrant must "describe the property to be seized with reasonable specificity," it need not do so with "elaborate detail." *United States v. Hill*, 19 F.3d 984, 987 (5th Cir. 1994) (citation omitted). A warrant must also not be overbroad, meaning there must be probable cause to seize the things named in the warrant. *United States v. Sanjar*, 876 F.3d 725, 735 (5th Cir. 2017). "Together, the two aspects of the Fourth Amendment require that (1) a warrant provide sufficient notice of what the agents may seize and (2) probable cause exist to justify listing those items as potential evidence subject to seizure." *Id.* at 735–36.

Lovings argues that the warrant's laundry list of items to be seized amounts to a "general warrant," unsupported by probable cause to believe the items listed would be found in the residence or were related to a crime. This argument is meritless. The warrant lists the items to be seized with specificity: books, records, invoices, and currency; jewelry; telephone and address books; photographs of individuals; materials used to cultivate, package and distribute illegal contraband; computers; firearms and ammunition; other controlled substances; and electronic devices, such as cellular telephones, paging devices, and palm type organizers. Detective Valdez's affidavit also attests to his 14 years of experience working in narcotics and drug

trafficking investigations and 25 years of experience in law enforcement. The affidavit specifically states that Valdez knows "from training and experience" that narcotics traffickers keep records, weights, phone numbers, and books and store information on their cell phones, and computers, as well as videos and photos of money and other trophies. The affidavit adequately specifies the items to be seized, and the "warrant was sufficient in its particularity to permit an executing officer to presume it to be valid." *United States v. Massi*, 761 F.3d 512, 531 (5th Cir. 2014).

In sum, even if the warrant were deemed to lack probable cause,[3] the fruit of the search is admissible under the "good faith exception" to the warrant requirement. The officers were objectively reasonable in relying on the warrant; the affidavit supporting the warrant was not a "bare bones" affidavit; and the warrant described the items to be seized with particularity. Thus, Lovings's motion to suppress evidence should be denied.

### III. Motion to Suppress Statement

Lovings argues that his signed acknowledgement of possession of the contraband seized as a result of the search warrant must be suppressed because it was obtained by unlawful coercion. Lovings contends that he only signed the acknowledgment form because officers threatened to call Child Protective Services ("CPS") to remove his infant baby and threatened to pursue the arrest of Blackwell if he did not take responsibility for the contraband. Lovings also claims that the acknowledgment form was blank when he signed it.

The Fifth Amendment prohibits the use of compelled testimony in the prosecution's case in chief. *Oregon v. Elstad*, 470 U.S. 298, 306–07 (1985). To secure the Fifth Amendment privilege against self-incrimination, the Supreme Court recognized an exclusionary rule in

---

[3] Although the Court need not reach the issue of whether the affidavit establishes probable cause, the undersigned notes that it would be difficult to argue that it does not.

*Miranda v. Arizona*, 384 U.S. 436 (1966), which requires interrogating officers to provide a suspect with specific warnings to counter the inherently coercive nature of custodial interrogation. *United States v. Cardenas*, 410 F.3d 287, 292 (5th Cir. 2005). Failure to administer *Miranda* warnings creates a presumption of compulsion. *Elstad*, 470 U.S. at 307. "Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*. *Id.*

Once *Miranda* warnings have been given, a suspect may knowingly and intelligently waive his *Miranda* rights and agree to answer questions. *Cardenas*, 410 F.3d at 292. A waiver of *Miranda* rights is only effective if voluntary. *Id.* This voluntariness determination is made on a case-by-case basis and is viewed under the totality of the circumstances surrounding the interrogation. *Id.* at 293. "A crucial aspect is the presence or absence of coercive behavior on the part of the government." *Id.* The waiver must be both voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception and must also have been voluntary in the sense that it was made with a full awareness of both the nature of the right being abandoned and the consequences of abandoning it. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

In evaluating voluntariness, the court considers the following six factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his or her right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Solis*, 299 F.3d 420, 436 & n.21 (5th Cir. 2002).

In his affidavit and live testimony, Lovings recounted the execution of the search warrant as involving an early morning no-knock entry into the residence by a large number of officers in tactical gear with guns drawn.  The officers breached the front door, shattered a glass window, and entered the residence screaming, "SAPD, search warrant!"  The officers found Lovings and Blackwell asleep naked in the master bedroom with their infant child in a bassinet nearby.  Detective Brian White, a detective with over 20 years of experience with SAPD involved in the warrant's execution, testified that the decision to execute the search warrant as a no-knock warrant was due to the fact that officers conducting surveillance in the area had identified a security camera outside of the residence and there was concern that Lovings might have otherwise prepared for the officers' arrival by arming himself and destroying the evidence, particularly in light of the officers' knowledge that he had previous convictions for being a felon in possession of a firearm and there were likely guns in the house.  Detective White's testimony was credible and the undersigned finds that the no-knock warrant was executed for safety reasons.

During the hearing, the parties presented multiple recordings from body cameras worn by the officers involved in the execution of the warrant, which confirmed Lovings's description of how the officers entered the residence.  The recordings depicted a large number of officers, forcefully entering the residence, storming through the home, with weapons drawn.  The recordings also demonstrated that once the officers found Lovings and Blackwell in the bedroom, the officers became calm, as both Lovings and Blackwell were completely compliant with the officers' directives.  A male officer helped Lovings put on some shorts.  A female officer retrieved Blackwell's robe and helped her pick up the baby.  Once Lovings was in handcuffs, the officers replaced their weapons in their holsters.  The recordings did not depict

9

any resistance to the officers' directives on the part of either Lovings or Blackwell. Lovings was calm and cooperative.

Testimony at the hearing established that the officers turned off their body cameras after Lovings was secured; thus, there are no recordings of the interrogation of Lovings and his provision of the signed acknowledgment form. Sergeant Kevin Nogle, an SAPD officer with 27 years of experience, testified that he was responsible for the safe and proper execution of the search warrant, as well as the use of body cameras. According to Nogle, the warrant was executed in what has been designated by the federal government as a High Intensity Drug Trafficking are ("HIDTA"),[4] and therefore the body camera usage was governed not just by SAPD, but also HIDTA, policies. Nogle testified that because confidential informants and undercover officers in plainclothes are involved in investigations in such areas, and were involved in the warrant execution here, HIDTA policies provide that officers may turn off their body cameras once the scene is secure to minimize their risk that their cover will be compromised. According to Nogle, the use of body cameras in the execution of the search warrant at issue in this case complied with HIDTA policy. Other officers testified consistently—that HIDTA policy dictated that they to turn off their body cameras after Lovings was handcuffed and the scene secure.

In his affidavit and hearing testimony, Lovings stated that, after the body cameras were turned off, he was taken to the porch and the officers brought Blackwell and the baby outside, while they searched the residence. He also testified that after the search, Detectives Nick Stromboe and Valdez, as well as additional officers, brought Lovings inside and told him that

---

[4] HIDTA is a Congressionally created program run by the Drug Enforcement Agency that coordinates cooperation between federal law and state and local enforcement and provides assistance to state and local agencies operating in areas deemed to be critical drug-trafficking regions in the United States. *See* https://www.dea.gov/hidta (last visited Nov. 6, 2020).

they had found drugs in the home.  According to Lovings, he was then told that he "could be a man and take responsibility for the drugs" or that the officers would call CPS and have the child taken from Blackwell and have Blackwell arrested.  Lovings claims that under the influence of this alleged coercion, he signed a blank acknowledgment form provided to him by the officers. Lovings testified that when he signed the form, he believed he was only taking responsibility for the drugs but later discovered that the officers had added not just drugs but also the firearms to the form.  Lovings testified that he would not have signed the form but for the threat about Blackwell's arrest and CPS.  Lovings's affidavit further states that after his signature was obtained, Blackwell was brought back into the house and that he and Blackwell were then provided with the required *Miranda* warnings.  Lovings testified that Officer Stromboe then warned Blackwell and Lovings that they would continue to search the residence and that if anything else was found, "everyone was going to jail and the baby to CPS."  Lovings states that at this point Blackwell confessed to having two firearms in the house and disclosed their locations and told the officers that Lovings was not aware of the guns and that they were hers.

Both Detectives Stromboe and Valdez separately provided testimony contradicting that provided by Lovings at the hearing.  Both detectives testified that Lovings was cooperative throughout the execution of the warrant and that, because of this cooperation, Valdez retrieved a voluntary acknowledgement form from his vehicle.  Both Stromboe and Valdez testified that Lovings willingly signed the acknowledgement form after Valdez provided him with the required *Miranda* warnings.  Both Stromboe and Valdez further testified that neither of them, nor any other officer, mentioned CPS before providing Lovings with the acknowledgment form. Rather, both officers testified that Lovings was eager to cooperate and, in fact, attempted to gain favorable treatment during their encounter by providing information on the crack supplier and

the guns, as well as intelligence on the ongoing gang wars in the San Antonio area, but it was information the officers already had. Lovings denied attempting to provide confidential information of any kind to the officers.

Valdez also testified that Lovings was eager to take responsibility for the drugs and guns and to "leave Blackwell out of it." According to both detectives, Lovings directed the officers to the location of the firearms. Valdez testified emphatically that Lovings was not provided with a blank acknowledgment form and that Valdez had filled out the items he had found—drugs, firearms, and ammunition—prior to obtaining Lovings's signature.

ATF Officer David Larios testified that he and another agent were called to the scene to interview Lovings further regarding the firearms and obtained a second confession after providing Lovings again with *Miranda* warnings. Larios's description of Lovings's demeanor was consistent with the demeanor described by Stromboe and Valdez, as Larios testified that Lovings willingly volunteered information about the firearms and that Lovings's demeanor throughout the encounter was calm, direct, and conversational. Larios also testified that there was no mention of CPS or coercion involved in this interview. The officers and agents who testified described the encounter with Lovings as lasting only 30 to 45 minutes total.

Notably, Valdez also testified that officers would not have used the threat of calling CPS or implied they had any discretion over that matter because the officers were required to report to CPS the presence of an infant in this situation. Further, the officers were aware that Blackwell had had several other children removed by CPS (some of whom were Lovings's children, too) and had recently avoided CPS by absconding from the hospital with the newborn infant found at the residence.

Viewing this testimony and evidence in the context of the six factors identified by the Fifth Circuit in evaluating coercion, the undersigned concludes that Lovings voluntarily waived his Fifth Amendment right to be free from self-incrimination and that the admissions he provided were not obtained through improper coercion.  The descriptions of Lovings by Valdez, Stromboe, and Larios as cooperative and calm are consistent with the video recordings of Lovings from approximately 30 minutes prior to the interview with the detectives, in which Lovings is depicted as willingly following officer directives without any resistance. The undersigned also finds the testimony of Valdez, Stromboe, and Larios unequivocally denying the presence of any coercive tactics in the encounter with Lovings as credible.  The testimony of Lovings, on the other hand, was far less credible, especially in light of his cooperation as depicted in the video recordings and Valdez's testimony that the officers were duty bound to contact CPS.  The short time frame involved is also inconsistent with Lovings's allegations of coercion.  Because Lovings's admissions were voluntarily made and were free from coercion, his motion to suppress statements should be denied.

## IV.  Conclusion and Recommendation

Having considered Defendant's motions to suppress, the Government's responses thereto, the evidence adduced at the live hearing, and the arguments of counsel, the undersigned recommends that Defendant's Motion to Suppress Evidence [#25] and Defendant's Motion to Suppress Statement [#26] be **DENIED**.

## V.  Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified

mail, return receipt requested.  Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The party shall file the objections with the Clerk of Court and serve the objections on all other parties.  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000).  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the un-objected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

SIGNED this 9th day of November, 2020.

_____
ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE